## STATE v. ROBERT GOODE.

### (Filed 16 May, 1923.)

**Criminal Law—Assault—Secret Assault—Evidence—Appeal and Error— Prejudicial Error—New Trials.**

Upon the trial for a secret and felonious assault, there was testimony by the prosecutor that while he was plowing his field he had been struck by several spent No. 4 shot, evidently fired from a clump of pines, from which powder smoke issued, whereupon he went to his house and returned with his gun; and for the defendant, a lad, that he had attempted to shoot a dog about at this location, supposing it to be mad, according to instructions theretofore given him by his father, which was strongly corroborated and not contradicted, and did not know he had accidentally shot the prosecutor until he saw him returning with his gun, and was then afraid to tell him of his attempt to shoot the dog, and in consequence of this fear he had left home for several days, when he returned and gave himself up to the officer of the law. There was little or no motive shown for the shooting: *Held*, the testimony of the prosecutor that the boy's father had offered him money not to prosecute his son was reversible error, there being no suggestion that it was made in the presence of the son or with his knowledge; and further *held*, the whole evidence was scarcely sufficient for conviction.

APPEAL by defendant from *Bryson, J.*, at the Fall Term, 1922, of RUTHERFORD.

Indictment for secret and felonious assault on one Joseph Johnson, and with intent to kill. There was verdict of guilty, judgment, and defendant excepted and appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*O. M. Mull, Clyde R. Hoey, and Quinn, Hamrick & Harris for defendant.*

HOKE, J. On the trial, J. L. Johnson, the prosecutor, testified in effect as follows: "I live near High Shoals Church in this county, and have since 1 May. On the 4th day of last April I was living a near neighbor to Robert Goode; and was plowing up an old clay road out by my house to the main road and about 9 o'clock Robert Goode came to me and asked if I needed any work done, and I said not then, but that I would have some that evening, and I told him his father had forbid me paying him any more change, and that I could not work him any more unless they fixed that; he owed me a sack of cottonseed meal, and he spoke of working and paying it. I was plowing in this old road that leads up to the main road, and Robert Goode was living with his father. I was going to put the road in corn. About 9 o'clock Robert came to ask to work

47—185

for me, and he left me in a short time and went towards home, and said he would be back at one o'clock, and about 11 o'clock there was a gun fired and I felt a shot hit me on the neck, and I looked below in some little pine bushes and smoke was boiling up all around the pine bushes.

"I looked for something like a minute and dropped the mule traces loose and went to the house and came back. When I came back to where I was at work I saw Robert going towards home with a shotgun in his right hand. When the shot was fired I was plowing in the road that led to my house from the public road. I was 58 steps from the bushes where the gun fired. The shot that struck me was No. 4. I think I hollered when the shot hit me. Mr. Causby came along after that, but no one came when the shot was first fired.

"When I later saw Robert Goode he was one-quarter mile from where the shot was fired, and that was after I had been to the house and come back several minutes; I was within 200 yards of the house. Where I was standing when the shot was fired was 3 to 4 feet higher than the bushes from which the shot was fired. The cornstalk land was below me and between me and the bushes. I heard the shot rattle in the cornstalks and went and looked and the shot holes had went through the stalks. I was plowing across and there was a gulley or ditch line; not much difference from there to the end and where I was shot. When I got to the end of the row I did not see any sign of a man around the bushes; my first notice was when I felt a shot. A little later on I was at the store and Robert Goode and his father went on up the road in a buggy; I took out a warrant for him. I did not know of Robert having anything against me, and I had never had any trouble with him up until this, and had not had any trouble with the boy on that day, and he had been working for me some that spring. Two of the shot grazed the skin in my neck and I brushed them off with my hand. I went straight to the house, not having seen who fired the shot from the two little pine bushes. I was on higher ground than those bushes. I brought my gun back from the house, and then it was I saw Robert running. I was not excited. I had not seen any dog, and I knew the shots had hit me. Robert said at the recorder's trial that he had shot at the dog, and told me so later."

Defendant testified as follows: "I am the defendant in this case. The morning all this happened, when I got up, the dog had been there and I aimed to kill it, and father told me to kill it that morning. And I had sore eyes and was not able to work, and he said just to stay home and kill that dog, and I got out there after breakfast and hunted for it, and it was gone, and I went to Johnson's to see him about some work, and as I was going back down I found the dog laying there, and I went up to it to tie it until I could kill it, and the dog lay there and looked

like a mad dog going to have a fit; I had told mama I was not sure about killing it; that I was afraid Mr. Gray's folks would not like it, and she said to go on and kill it, to get Mr. Merchant's gun. I went to Merchant's house to get the gun and went back to where I had left the dog and when I got to within a short distance of where I had left it the dog got up and lit out through the bushes, and as it went through the bushes I just had one shell and I thought it would get away and I shot. When I fired I did not see Johnson, and I had no purpose to hit him. I was in the woods when I fired, and the dog came back by me and went off down the creek. I had talked with Johnson that morning in the field.

"We had not had any trouble; I thought a heap of him and had no malice and no desire to injure him. After I fired the shot I did not go to him because I was afraid he would be mad at me; I did not want any trouble; as I was going back home I saw him coming with his gun. Johnson went and got his gun and I went home, and then I went off because I was afraid of Mr. Johnson, but pretty soon I came back of my own accord and gave up to the officer. I did not know Johnson was plowing up the road. He was near his house when I saw him that morning.

"The dog looked like it was mad. If my father was angry about the road I did not know of it. He had not said a word about plowing up the road. I was down on the creek when I found the dog, and it was about 11 o'clock when I fired the shot. I borrowed the gun to kill the dog. I was on kinder top of the hill and Johnson was in the flat from the place he showed my father he was standing. I do not remember any bushes except the pines. I stated Johnson is my friend, and I did not intend to shoot him. I would have went up to Johnson's but I was afraid he would be mad. I went on to a neighbors and told him I shot and heard Johnson holler, and I was afraid in shooting at the dog I had hit him. I was aiming to go to him but saw him with the gun, and was afraid. I never had any trouble with Johnson about anything. I never threatened to shoot Johnson, but I did aim to hit dog. I thought that the dog was mad from the way he acted when I found him."

C. L. Green testified for defendant: "I had a conversation with Robert Goode about 12 o'clock at our store. I was talking about Johnson being shot and was phoning for the bloodhounds to come and trace up the fellow, and he stated that it might have been him but he would not call Johnson out and ask him because he was afraid he would be mad and make trouble. Johnson was not present, but was at the store phoning for the sheriff to bring the bloodhounds. I saw Robert three or four days after that at Mr. Bartee's."

Street Lovelace testified: "The day the dog was shot I was working on the land between Mr. Merchant's and Mr. Goode's. Before the shoot-

ing Robert came along the road with the gun and I said you ain't going to borrow a gun to go out hunting, and he said that dog Grays had left looked like it was mad, and that his mama wanted him to kill it, and I replied that if the dog looked like it was mad to kill it whether the Grays like it or not.    That was a little bit before eleven o'clock; he was going back home from Merchant's with the gun on his shoulder, and it was before the shooting took place."

Cross-examination:  "I was plowing and did not see the dog."

Redirect examination:  "I did not see the dog that day, but did a little later when Robert came in to give up.    The dog had been shot in the shoulder and I saw holes where the shot went and dry scabs.    I do not know who shot the dog, but the holes and the scars were there."

Claud Bostic testified:  "I saw this dog after the shooting a few days and found places on his back where shot went in."

J. Andy Goode, father of the defendant, testified:  "I am the father of Robert Goode.    On the day of the shooting I told Robert to get a gun and kill the dog.    His eyes were sore, and the dog had been eating up eggs, and I told Robert to kill it.    When I got to the edge of the field beyond Johnson's I heard a gun fire and seen smoke rise, and when I got in view of his place I heard a gun fire and heard a dog holler.

"After dinner I took the gun home to Mr. Merchant's, Robert and I, and at the cross-roads Johnson was on the porch.    Johnson and I were talking about some cottonseed meal that he owed me.    He told me about the shooting, and I told him that Robert went over there to shoot a dog, and if he was shot it might be by accident, as I heard the gun fire the dog holler over in the woods or in the underbrush.    He did not accuse Robert of shooting him.    Later on Johnson showed me the place where he was standing.    I have nothing against Johnson.    We agreed that we would change the road and talked it over friendly."

Cross-examination:  "That dog was worthless and I wanted to get rid of him.    Bob had sore eyes and stayed at home.    Bob had been swapping work with Mr. Johnson and I then went on about my work and was one-quarter mile away when I heard a dog holler.    I did not hear Johnson holler and had no idea he was hurt.    When Robert came to dinner he told me he was afraid he had shot Johnson.    My boy went off for several days on account of the fact that he said Johnson was high-tempered and he said he was afraid of him."

In rebuttal, prosecutor, recalled, testified over defendant's objection that Andy Goode, father of the boy, had offered prosecutor $75 to make it up.    Defendant excepted.    Ruling of court in admitting this testimony being in terms as follows:  "In so far as admissions of defendant is concerned incompetent; competent as affecting Johnson."    There was

also evidence that both the prosecutor and defendant were persons of good character.

On this, a sufficient statement of the facts presented, we are of opinion that this evidence of the prosecutor as to the offer of adjustment by the father of defendant was erroneously admitted. On examination as a witness, the father had not been asked as to the circumstance, and so far as appears the offer was not made in the presence of defendant, nor with his knowledge or consent, nor did it tend in any legal way to corroborate the statements of the prosecutor. In our view the only possible effect of the evidence was to throw into the jury box a permissible inference that the father may have thought his son was guilty of the charge, and so interpreted its reception is not sanctioned by any recognized principle of law applicable to trials of this kind.

In *S. v. Lunsford,* 177 N. C., 117, to which we were cited by counsel for the State, there was pertinent evidence tending to show that the defendant himself had been cognizant of and a party to the offer of adjustment, but not so here, and the reception of the evidence as stated must be held for error.

On further and careful consideration of the record we deem it proper to say that as now advised and on the facts as now presented we see very little if any evidence that would justify or uphold a conviction for a felonious secret assault with intent to kill. A perusal of the evidence showing that both the prosecutor and defendant were of good character, and there had been no previous animosity or quarrel between them. That the occurrence was at least two hours after defendant had been with prosecutor in his field. That prosecutor was evidently struck by spent or deflected shot, as they did not penetrate, and were number fours fired at a distance within 180 feet. That before defendant was accused, and on hearing of the charge, he said to disinterested parties that he might have done it, as he had shot at a dog down there near Johnson's field, and his statement is confirmed by the proof that the dog in question had been shot as claimed. The single circumstance in the entire testimony that tends to inculpate is the fact that after the occurrence defendant ran away for a few days, and his explanation of that is not at all unnatural or forced; that knowing Johnson to be a high-tempered, irascible man, he was apprehensive of personal violence from him, and went away for a day or two until his anger should have time to cool down.

For the error indicated, we are of opinion that defendant is entitled to a new trial of the cause, and it is so ordered.

New trial.